UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JULIA RUSSELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:21-cv-191-JAW ) |
| PHILIP AUGUSTUS CHENEVERT, II | ) ) ) ) |
| Defendant. | ) |

**ORDER ON MOTION TO PRECLUDE PLAINTIFF FROM CALLING RULE 415 WITNESS**

After the Court granted a plaintiff's late motion to amend her witness list to include a Federal Rule of Evidence 415 witness at an upcoming trial, the defendant deposed the witness and raised new arguments that the plaintiff should be precluded from calling the witness. After considering the parties' arguments along with additional information brought to light in the witness' deposition, based on the existing record, the Court finds that the probative value of his testimony is substantially outweighed by a danger of unfair prejudice and confusing or misleading the jury—especially where the Court has already permitted the plaintiff to call two other Rule 415 witnesses—and preliminarily grants the motion to preclude.

**I.  BACKGROUND**

Julia Russell filed a civil action against Philip Chenevert on July 9, 2021, alleging that Mr. Chenevert had sexually abused her when she was a child. *Compl.* (ECF No. 1). On December 7, 2021, Mr. Chenevert answered the Complaint, denying the allegations. *Answer* (ECF No. 18). The parties engaged in discovery and the

discovery period closed on May 24, 2022. *Scheduling Order* (ECF No. 19); *Order* (ECF No. 21). The case was scheduled for trial in October 2022 and on October 3, 2022, a jury was selected. *Min. Entry* (ECF No. 73). However, as three jurors became unavailable for personal reasons between jury selection and trial and as the number of jurors had fallen below six, on October 16, 2022, the Court continued the trial pursuant to Federal Rule of Civil Procedure 48(a). *Notice* (ECF No. 89).

With jury selection scheduled for January 3, 2023 and trial to commence January 23, 2023, Ms. Russell moved on November 21, 2022 to amend her witness list to include two trial witness: Christiane Hennedy and Justin Nezol. *Mot. for Leave to Am. Pl.'s Witness List* (ECF No. 99). On November 29, 2022, Philip Chenevert objected only to the listing of Justin Nezol. *Def.'s Opp'n to Pl.'s Mot. for Leave to Am. Witness List* (ECF No. 100). On December 15, 2022, the Court granted Ms. Russell's motion as to both witnesses. *Order on Mot. for Leave to File Am. Witness List* (ECF No. 101) (*Order on Mot. to Am.*).

On January 9, 2023, after deposing Mr. Nezol, Mr. Chenevert filed a motion to preclude Ms. Russell from calling him as a Rule 415 witness. *Def.'s Mot. in Limine to Preclude Pl. from Calling Justin Nezol as a Third Rule 415 Witness* (ECF No. 109) (*Def.'s Mot.*). On January 12, 2023, Ms. Russell filed her opposition to the motion. *Pl.'s Opp'n to Def.'s Mot. in Limine to Exclude Testimony of Justin Nezol* (ECF No. 110) (*Pl.'s Opp'n*).

## II. THE PARTIES' POSITIONS

### A. Philip Chenevert's Motion

Mr. Chenevert's motion argues that Mr. Nezol's testimony should be precluded under Federal Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Def.'s Mot.* at 6 (citing FED. R. EVID. 403). In Mr. Chenevert's view, Mr. Nezol's testimony is unfairly prejudicial, needlessly cumulative, and "will present evidentiary complications" that undermine its probative value. *Def.'s Mot.* at 6-10.

Regarding unfair prejudice, Mr. Chenevert reiterates the objections he made to the inclusion of the other Rule 415 witnesses, contending that permitting a third such witness "enhances the danger that the jury will condemn Defendant not because Plaintiff has proven her claim but because there are simply so many accusers that Defendant must be guilty of at least something." *Id.* at 6.

In addition to prejudice, Mr. Chenevert contends that "adding a third Rule 415 witness is a waste of time and needlessly cumulative." *Id.* at 7. In his view, "Mr. Nezol's allegations add nothing new, and are more dissimilar from Plaintiff's allegations than the allegations of the other Rule 415 witnesses." *Id.* Mr. Chenevert notes that the Court has found that the anticipated testimony from the two existing Rule 415 witnesses is already "very prejudicial" to Mr. Chenevert and "powerful[ly] corroborative" to Ms. Russell, and thus submits that "there is no need to add Mr. Nezol as a third Rule 415 witness." *Id.* (citing *Order on Mot. in Limine* at 15-16 (ECF No. 43)).

3

Mr. Chenevert acknowledges that the First Circuit has affirmed the admission of three Rule 414[1] witnesses in *United States vs. Joubert*. *Def.'s Mot.* at 7 (citing 778 F.3d 247 (1st Cir. 2015)). He contends, however, that the First Circuit in that case found only that the District Judge did not abuse his discretion in admitting the third witness and submits that "*Joubert's* language implies that the First Circuit may have excluded one or more of the Rule 414 witnesses as being cumulative, had the First Circuit been writing on a clean slate." *Id.* at 7-8 (citing 778 F.3d at 253, 255).

Finally, Mr. Chenevert argues that "adding Mr. Nezol will present evidentiary complications." *Id.* at 8. Specifically, if Ms. Russell calls Mr. Nezol, Mr. Chenevert "will raise that Mr. Nezol's story of how and when he came forward in late 2022 is strikingly different from what Plaintiff's motion to amend her witness list establishes," primarily that "more information was shared during the October 2022 conversation [between Mr. Nezol and Attorney Asen] than what was previously testified to." *Id.* at 8-9. Mr. Chenevert professes "no desire to call either of Plaintiff's attorneys as witnesses to lay [that] predicate" but submits that these "evidentiary complications . . . carry[] a risk of juror confusion by pitting Plaintiff's counsel's credibility against Mr. Nezol's credibility, [and] substantially outweigh the marginal relevance of Mr. Nezol's testimony." *Id.* at 10.

B.  **Julia Russell's Response**

In her opposition, Ms. Russell first submits that Mr. Chenevert's conduct towards Mr. Nezol constitutes child molestation under Federal Rules of Evidence 414

---

[1]   Rule 414 is the criminal rule analogue to Rule 415.

4

and 415. *Pl.'s Opp'n* at 4. She then contends that the probative nature of his testimony is not outweighed by the risk of unfair prejudice. *Id.* at 5. Ms. Russell argues that "Mr. Nezol was abused during a similar time-period in his life as Plaintiff and the other victims and in the same general timeframe as Plaintiff and the other victims; he was abused in Mr. Chenevert's home—specifically, in Mr. Chenevert's bedroom; and Mr. Nezol was subjected to similar types of sexual abuse as other victims, including digital penetration." *Id.* Additionally, she suggests that "the abuse of Mr. Nezol demonstrates a consistent modus operandi in [Mr. Chenevert's] approaching his victims, thereby corroborating aspects of [Ms. Russell's] testimony." *Id.* at 6 (citing *Joubert*, 778 F.3d at 254) (internal quotations omitted).

Ms. Russell adds that the "probative value of Mr. Nezol's testimony, like Ms. Schick and Ms. Hennedy's, is powerful because Mr. Chenevert continues to deny that the abuse ever took place" and that it is, in fact, "even more powerful when considered in light of the fact that Defendant is likely to characterize the case . . . as a 'he said, she said' case." *Id.* She also rejects Mr. Chenevert's argument that Mr. Nezol's testimony is cumulative, noting that the First Circuit previously permitted the testimony of three Rule 415 witnesses. *Id.* at 7.

Additionally, Ms. Russell submits that Mr. Nezol's testimony satisfies Rule 104(b), which requires that to admit Rule 415 testimony "the trial court . . . examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Id.* at 8 (quoting *Huddleston v. United States*, 485 U.S. 681, 690 (1988)). She notes that "a jury would certainly

have a basis for crediting the testimony of Mr. Nezol," as he has testified under oath, previously reported the abuse to his mother and to police, came forward with history without any prompting from Ms. Russell, and "does not have any apparent motive to fabricate his story." *Id.*

Finally, Ms. Russell counters that "there are no 'evidentiary complications' complicating Mr. Nezol's testimony." *Id.* She offers that Mr. Nezol's "imperfect memory about what he shared with Plaintiff's counsel is not a basis to exclude his testimony." *Id.* Ms. Russell rejects Mr. Chenevert's "suggest[ion] that he would need to call Plaintiff's counsel in order to point out the inconsistency in Mr. Nezol's testimony," rejoining that "[t]his is simply not so" as she "is willing to stipulate that Mr. Nezol relayed the facts in Plaintiff's Amended Witness List before the document was served" and "has no objection to Defendant using that document to impeach Mr. Nezol." *Id.* at 9.

### III. LEGAL STANDARD

Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Rule 415 allows that "[i]n a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault or child molestation." FED. R. EVID. 415(a).

6

The seminal case in the First Circuit interpreting Rule 415(a) is *Martinez v. Hongyi Cui*, 608 F.3d 54 (1st Cir. 2010). After noting that Rule 415 had been adopted as part of the Violent Crime Control and Enforcement Act of 1994, the First Circuit observed that the "drafters' purpose was to supersede Rule 404(b)'s prohibition on evidence of like conduct showing propensity in sexual assault cases." *Id.* at 59. Significantly, the First Circuit wrote that "[w]e agree with the conclusion, universal among the courts of appeals, that nothing in Rule 415 removes evidence admissible under that rule from Rule 403 scrutiny." *Id.* at 60. The *Martinez* Court acknowledged that "evidence that Rules 413-415 make admissible—evidence of similar sexual assaults by the defendant—can well be the kind of inflammatory, unduly complex evidence courts often exclude under Rule 403." *Id.* Nevertheless, the First Circuit declined to "adopt special rules constraining district courts' usual exercise of discretion under Rule 403 when considering evidence under Rule 415." *Id.* At the same time, district courts "must apply Rule 403 with awareness that Rule 415 reflects a congressional judgment to remove the propensity bar to admissibility of certain evidence."[2] *Id.*

## IV.   DISCUSSION

In its Order permitting Ms. Russell to amend her witness list to add Mr. Nezol, the Court "acknowledge[d] that the potential testimony of a third victim who is not the Plaintiff complicates the balance between probative value and prejudicial impact." *Order on Mot. to Am.* at 6. The Court concluded that "[a]t [that] point,

---

[2]   For a detailed analysis of the First Circuit's interpretation and application of Rule 415, see *Order on Mot. in Limine* at 10-14.

7

because no discovery ha[d] taken place regarding Mr. Nezol's accusations, the record [was] too vague for the Court to rule on ultimate admissibility" and the Court would "address Mr. Chenevert's objections to the testimony of Mr. Nezol once the parties have presented further information about the nature of his evidence and any defense response." *Id.* Now that this additional information and response are before the Court, the Court finds that—where two other Rule 415 witnesses will already be testifying to the same evidentiary point—the prejudicial and cumulative nature of Mr. Nezol's expected testimony, dissimilarities between his account and the accounts of other alleged victims, and complications likely to arise from inconsistencies regarding the timing and substance of his communications with Ms. Russell's attorneys, together tip the scales toward excluding his testimony. The Court thus grants Mr. Chenevert's motion to preclude Ms. Russell from calling Mr. Nezol as a witness.

### A.  Probative Value

Attorney Asen has represented that, if called as a witness, Mr. Nezol would testify:

> Mr. Nezol is 30 years old. He grew up in Arundel, Maine and, like Plaintiff and her Rule 415 witnesses, Mr. Nezol's parents were friends with Defendant. Like Plaintiff and her Rule 415 witnesses, Defendant bought Mr. Nezol gifts and toys that encouraged Mr. Nezol to like and trust Defendant.
>
> Defendant would babysit Mr. Nezol when he was in the 6th, 7th, and 8th grades. Mr. Nezol would go over to Defendant's home in Kennebunk. That is where the abuse began and is the only place where Mr. Nezol recalls he was abused by Defendant.

8

> Specifically, Defendant would invite Mr. Nezol to sleep in his bed and Defendant would put his hands down Mr. Nezol's pants and touch his body, buttocks, and genitals. Defendant would also rub his genitals on Mr. Nezol's body and buttocks and encourage Mr. Nezol to watch pornographic movies with him. Finally, Mr. Nezol remembers seeing Plaintiff at Defendant's home when he was a child.

*Mot. to Am.* at 2.

To begin, when a defendant accused of sexually abusing a child denies committing the offense, evidence bearing on the victim's veracity is probative to determining guilt or innocence. *Joubert*, 778 F.3d at 254. Testimony of another victim can be probative of this victim's veracity where "it corroborate[s] aspects of [the victim's] testimony, particularly the nature of the abuse and [the defendant's] modus operandi in approaching his victims." *Id.* at 254-55. The Court finds important similarities between Ms. Russell's and Mr. Nezol's accounts regarding the nature of their alleged abuse and Mr. Chenevert's modus operandi that give Mr. Nezol's testimony probative value: Mr. Chenevert was a friend of their parents, bought them toys, would babysit them overnight at—among other locations—his home, and would sexually abuse them during these overnight stays. *See Mot. to Am.* at 2; *Compl.* at ¶¶ 11-18.

### B. Dissimilarities Between the Accounts

While Mr. Nezol's expected testimony has some probative value, its value is undercut by dissimilarities with Ms. Russell's account (and with the accounts of the other Rule 415 witnesses) and inconsistencies regarding the timing and substance of Mr. Nezol's communications with Ms. Russell's attorneys. In *Martinez*, the First Circuit upheld the district court's exclusion of the proffered Rule 415 evidence on two

9

grounds: (1) the two incidents were too dissimilar, and (2) to prove the "other act" evidence, the trial court would have had to allow a "'minitrial,' indeed something 'in the nature of a maxitrial.'" 608 F.3d at 61. *See also Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 158 (3d Cir. 2002) ("exclusion of the evidence [was] justifiable" because of "the differences between [the defendant's] alleged assaults of [the Rule 415 witness] and [the plaintiff]" which "reduced significantly the probative value of [the Rule 415 witness'] testimony"); *Doe ex rel. Rudy–Glanzer v. Glanzer*, 232 F.3d 1258, 1269–70 (9th Cir. 2000) (upholding exclusion of prior sexual assault evidence as too dissimilar because of age difference between victims and the dissimilar circumstances of the alleged misconduct). The *Martinez* Court conducted a fact-intensive comparison of the two accounts, ultimately finding that "there were significant medical distinctions in the two treatment situations that would have required extensive explanation," thereby constituting a reason to "exclude [the witness'] testimony as potentially unfairly prejudicial and, so, likely to confuse the issues or mislead the jury." *Id.* Likewise, in *U.S. v. Majeroni*, the First Circuit noted that "[t]he fact that the prior conduct was similar to the charged conduct enhanced its presumed probativeness," 784 F.3d 72, 76 (1st Cir. 2015), implying that, in the inverse, dissimilarity would diminish testimony's presumed probativeness.[3]

The Court noted in its Order admitting the testimony of Rebecca Schick and Alex Hennedy as Rule 415 witnesses that:

---

[3]   *Martinez* and *Majeroni* suggest that dissimilarity can be considered on either side of the Rule 403 balancing equation: as increasing prejudice by confusing or misleading the jury; or as decreasing probativeness. Regardless of where it is factored into the analysis, the law is clear that dissimilarity weighs against admission.

10

> [T]he similarity among the allegations of Ms. Russell and Ms. Schick and Ms. Hennedy is striking. Each female was about the same age when the alleged abuse began. Their families were all friendly with Mr. Chenevert. All three females describe similar approaches by Mr. Chenevert: demands for kissing and Mr. Chenevert using his tongue during the kiss. They were all residents of the Biddeford, Maine area. The locations of the abuse are similar. Ms. Hennedy alleged that the first incident of abuse took place in her home. She testified that the second incident took place in Mr. Chenevert's home. Ms. Russell and Ms. Schick allege that the abuse occurred in his home, boat, and business.

*Order on Mot. in Limine* at 14-15 (citations omitted). While Mr. Nezol's account shares some details with the accounts of the three female accusers, the similarities are more muted. Ms. Russell was between six and eight years old at the time of the alleged abuse. *Compl.* ¶ 17. Ms. Schick was "between eight and twelve years old." *Mot. in Limine to Admit Evidence of Similar Acts of Child Molestation and Notice of Intent to Use Such Evidence* (ECF No. 30), Attach. 9, *Dep. of Rebecca Schick* at 13:3 (*Schich Dep.*). Ms. Hennedy was eight years old and in the fourth grade. *Id.*, Attach. 2, *Dep. of Alexandra Hennedy* at 18:9-10 (*Hennedy Dep.*). Mr. Nezol, by contrast, was allegedly abused between the end of fifth grade and eighth grade, when he was approximately between ten and fifteen years old. *Def.'s Mot.*, Attach. 1, *Dep. of Justin Nezol* at 49:25-50:14 (*Nezol Dep.*). Mr. Nezol thus, in addition to being the only male, was notably older than the other witnesses when the alleged abuse ceased. These differences do not by themselves suggest he is being untruthful, but his account is less similar to Ms. Russell's than are the accounts of the other two Rule 415 witnesses, offering a weaker justification for admission under the Rule 403 analysis.

There are also differences in the abuse alleged. While "[a]ll three females describe similar approaches by Mr. Chenevert: demands for kissing and Mr. Chenevert using his tongue during the kiss," *Order on Mot. in Limine* at 14-15, Mr. Nezol alleges that Mr. Chenevert showed him "how to kiss on a hand" but did not attempt to kiss him. *Nezol Dep.* at 46:24-47:2. Also unlike the female victims, Mr. Nezol recalls Mr. Chenevert "dry hump[ing]" him and showing him "R-rated films with male/female genitalia." *Id.* at 47:10-18. While Ms. Russell alleges that Mr. Chenevert's conduct included "exposing himself to Ms. Russell and coaxing her to touch his exposed genitalia; and performing oral sex on Ms. Russell," *Compl.* ¶ 18, Mr. Nezol does not allege any of those behaviors.[4] These dissimilarities again do not inherently suggest untruthfulness; however, they do render the expected testimony less probative than Ms. Schick's and Ms. Hennedy's accounts and increase the potential for confusing the jury, weighing against admission.

### C. Cumulative Evidence, Prejudice, and Managing "Minitrials"

The other justification the *Martinez* Court offered to uphold the exclusion of proffered Rule 415 evidence was that, to prove the "other act" evidence, the trial court would have had to allow a "'minitrial,' indeed something 'in the nature of a maxitrial.'" 608 F.3d at 61. This supported the district court's judgment that the plaintiff's "case

---

[4] The Court recognizes that there are certainly notable similarities between the accounts. Ms. Russell summarizes that "Mr. Nezol was abused during a similar time-period in his life as Plaintiff and the other victims and in the same general timeframe as Plaintiff and the other victims; he was abused in Mr. Chenevert's home—specifically, in Mr. Chenevert's bedroom; and Mr. Nezol was subjected to similar types of sexual abuse as other victims, including digital penetration." *Pl.'s Opp'n* at 5 (the Court notes, however, that Ms. Russell alleges vaginal digital penetration while Mr. Nezol alleges anal digital penetration).

could get lost in the details of the 'maxitrial,' which would have been unduly prejudicial and likely to confuse the issues and mislead the jury." *Id.*

Here, where the jury will already receive the testimony of two Rule 415 witnesses in addition to Ms. Russell's, the further inclusion of Mr. Nezol's evidence would heighten the risk of a "maxitrial" that confuses or misleads the jury. Not only does Mr. Nezol's testimony not fit as neatly as Ms. Hennedy and Ms. Schick's, but Mr. Chenevert has also identified potential inconsistencies relating to the timing and substance of Mr. Nezol's communications with Ms. Russell's attorneys that—whatever their ultimate merit—risk complicating Mr. Nezol's "minitrial" and distracting the jury from the merits of Ms. Russell's case.

In his motion, Mr. Chenevert noted that Mr. Nezol testified that he first learned of Ms. Russell's lawsuit "a few weeks after" a Portland Press Herald news article that his stepfather brought to his attention. *Nezol Dep.* at 32:14-17. Mr. Nezol could not, however, identify when the article was published. *Id.* at 32:18-20. Mr. Nezol testified that he called the author of the Portland Press Herald article, "left a few messages and no one returned my calls." *Id.* at 34:15-23. He therefore "kind of just swept it under the rug." *Id.*

After his attempt to contact the Portland Press Herald reporter, Mr. Nezol said that he "called Taylor Asen to see if I could speak with somebody about the lawsuit." *Id.* at 35:11-14. He thought his call to Attorney Asen took place "[m]aybe a couple of months" after he read the Portland Press Herald article. *Id.* at 35:8-10. Mr. Nezol said that he thought he told Attorney Asen about his experiences with Mr. Chenevert,

13

but he was "not 100 percent on that and did not want to come across as dishonest." *Id.* 37:3-6. Attorney Asen told him that he would get back to him but never did. *Id.* at 37:7-11.

Mr. Nezol testified that either he then contacted Attorney Meryl Poulin or she contacted him; he was not sure. *Id.* 37:12-18. Mr. Nezol recalled that Attorney Poulin told him that she needed to talk to her client and speak with the judge and see "where everything stood." *Id.* at 39:5-9. He said Attorney Poulin called him back "[m]aybe a couple of weeks later." *Id.* at 39:10-12. Mr. Nezol only told Attorney Poulin that he had had a "similar experience" with Mr. Chenevert and did not go into detail. *Id.* at 38:10-21. Mr. Nezol said that the first time he went into detail with Attorney Poulin about his experience with Mr. Chenevert was on December 28, 2022, the day before his deposition. *Id.* at 41:2-10.

The Court's direct concern is not Mr. Nezol's credibility as a witness, but instead the risk that his testimony (and impeachment) will ultimately distract or confuse the jury. To provide context, it was on November 21, 2022, that Plaintiff's counsel moved to amend the witness list to include Mr. Nezol and represented that on October 31, 2022, Mr. Nezol contacted "Plaintiff's counsel" and "explained to counsel that he had been sexually abused by Defendant when he was a child." *Pl.'s Mot. to Am.* at 2.

The Court is having difficulty reconciling the dates of the published Portland Press Herald articles on the Russell allegations, the timing as described by Mr. Nezol, the odd lack of response by the Portland Press Herald reporter (particularly since

14

staff writer Emily Allen wrote an article about Ms. Schick and Ms. Hennedy coming forward), the equally odd lack of response by Attorney Asen to Mr. Nezol's phone call, and the confusion about when Mr. Nezol first described the details of his alleged sexual abuse.

The Court is having difficulty envisioning how these issues, which could affect Mr. Nezol's credibility, could be presented to the jury without affirmative representations by Ms. Russell's counsel as to when Mr. Nezol contacted them, how they responded, and what was said at different times. In her response, Ms. Russell proposed allowing defense counsel to use the Plaintiff's amended witness list to impeach Mr. Nezol or even stipulating that "Mr. Nezol relayed the facts in Plaintiff's Amended Witness List before the document was served." *Pl.'s Opp'n* at 9. Ms. Russell's proposal effectively counterposes her counsel's version of events over Mr. Nezol's, and all but concedes that their own witness testified inaccurately in his deposition, thereby undercutting his credibility. Mr. Nezol also testified that he asked Attorneys Asen and Poulin about representing him, which could provide further grist for impeachment. *Nezol Dep.* at 51:9-52:17.[5] Given these issues, the Court is troubled by the specter of a trial within a trial.

---

5. Mr. Nezol's deposition testimony on this point is less than crystal clear. By one interpretation, he asked the lawyers whether he could join Ms. Russell's lawsuit and by another, he asked whether they could represent him as a witness only. The Court cannot resolve which interpretation was correct but only notes that Mr. Nezol's deposition testimony would make him potentially vulnerable for cross-examination.

   Q. Now, when you contacted Attorney Asen or when you talked with Attorney Poulin, did you ask either of them if they could represent you in a claim against Mr. Chenevert?
   A. Well, when I initially called, I had wondered if I should be represented as well, but they informed me that there was a case specifically for Julia and that I would - - I could not - - they weren't going to represent me, so - -

15

This brings the Court to its concern that the Rule 403 analysis is significantly impacted by the previous admission of two other Rule 415 witnesses testifying to the same issue, which renders Mr. Nezol's expected testimony less probative and more prejudicial than otherwise. In its Order admitting Ms. Schick and Ms. Hennedy as Rule 415 witnesses, the Court noted that "[b]ecause it is powerful corroborative evidence, the testimony of Ms. Schick and Ms. Hennedy is prejudicial to Mr. Chenevert's defense, even in the words of *Joubert* 'very prejudicial.'" *Order on Mot. in Limine* at 15-16. The Court expects that Mr. Nezol's testimony, also accusing Mr. Chenevert of sexually assaulting him as a child, would be similarly "very prejudicial."

For Ms. Schick and Ms. Hennedy, the Court found that the probative value of their testimony justified the risk of prejudice because "[a]bsent Ms. Schick and Ms. Hennedy, the trial would come down to [Ms. Russell's] word against [Mr. Chenevert's]". *Id.* at 15. The testimony of Ms. Schick and Ms. Hennedy is thus "bound to affect a jury's evaluation of this credibility standoff." *Id.* The Court has also acknowledged, however, "that the potential testimony of a third victim who is not the Plaintiff complicates the balance between probative value and prejudicial

---

Q. So would it be fair to say you asked them to consider representing you, Justin?
A. I would say, you know, I definitely put the idea out there just feeling around to find out if it was something that I should be part of or not, but it wasn't my primary concern, I just kind of asked about it, you know.
Q. So when you say asked about it, did you ask them if they could represent you in a suit seeking damages against Mr. Chenevert; is that what you were feeling about?
A. Well, so I'm not super familiar with the proceedings of the court. I just didn't know that I needed an attorney to represent me to tell my side of the story. I did not ask to receive - - you know, I didn't want to file my own action for money, no. It was more that I wanted to be protected by a lawyer when I - - when I spoke about my situation.

*Nezol Dep.* 51:5-52:8.

16

impact." *Order on Mot. to Am.* at 6. At some point, the scales must tip, where an additional Rule 415 witness would not add enough probative value to the "credibility standoff" to justify the prejudicial impact of their inclusion.

The Court finds that, ultimately, this case has reached that point with Mr. Nezol's proposed testimony, which is sufficiently cumulative that its probative value is substantially outweighed by its potential for undue prejudice and confusing or misleading the jury. The Court noted previously that the First Circuit in *Joubert* "wondered if the testimony of three witnesses was cumulative and acknowledged that the other acts evidence was 'very prejudicial.'" *Order on Mot. in Limine* at 12 (quoting 778 F.3d at 233-55). While the *Joubert* Court upheld the District Judge's admission of three Rule 415 witnesses, it found only that "the district court did not abuse its discretion under Rule 403," rather than affirmatively endorsing the District Judge's decision. *Id.* at 254-55. Instead, the First Circuit noted that, while not an abuse of discretion, "the district court's admission of testimony from three other victims strikes us as potentially cumulative." *Id.* at 255.

"When assessing the probative value of evidence under Rule 403, a court must consider . . . whether the evidentiary point can be made with other evidence that does not present a risk of unfair prejudice." *United States v. Henry*, 848 F.3d 1, 9 (1st Cir. 2017). The evidentiary point that Mr. Nezol would make—that Mr. Chenevert has sexually abused other children in the past, thereby corroborating Ms. Russell's account that Mr. Chenevert sexually abused her—will already be made by Ms. Schick and Ms. Hennedy, whose narratives more closely align with Ms. Russell's. Mr.

17

Nezol's testimony thus offers a significantly diminished marginal benefit than it would standing alone as, in the Court's view, if the combined testimony of Ms. Russell, Ms. Schick, and Ms. Hennedy does not resolve the "credibility standoff," it is highly unlikely that Mr. Nezol's testimony would be the straw that breaks the camel's back.

That limited probative value is substantially outweighed by the risk of undue prejudice and confusion that would accompany Mr. Nezol's testimony. The Court is mindful of the First Circuit's guidance in *Martinez* that proving "other act" evidence can require a "minitrial" or "maxitrial" that may cause the instant case to "get lost in the details of the 'maxitrial,' which would [be] unduly prejudicial and likely to confuse the issues and mislead the jury." 608 F.3d at 61. The Court has already admitted two Rule 415 witnesses, which will necessitate two "minitrials" surrounding Ms. Schick's and Ms. Hennedy's accusations. There thus already exists some risk of the jury being confused or misled by three alleged victims making separate accusations against Mr. Chenevert.

This is a close call, but ultimately the Court finds that now adding a fourth victim, a fourth set of accusations, and a third "minitrial" tacked onto Ms. Russell's case would be needlessly cumulative, and tips the scales of the Rule 403 balancing equation such that the probative value of admitting Mr. Nezol's testimony would be "substantially outweighed" by the dangers of "unfair prejudice, confusing the issues, misleading the jury, . . . [and] needlessly presenting cumulative evidence." FED. R. EVID. 403.

The Court issues this ruling only preliminarily. If Ms. Russell wishes to present Mr. Nezol for live testimony out of the presence of the jury, the Court will allow her to do so and will allow Mr. Chenevert to cross-examine Mr. Nezol, so that the Court can assess whether its current concerns are alleviated or aggravated by Mr. Nezol's live testimony before the Court.

## V. CONCLUSION

The Court preliminarily GRANTS Defendant Philip Chenevert's Motion in Limine to Preclude Plaintiff Julia Russell from Calling Justin Nezol as a Third Rule 415 Witness (ECF No. 109).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of January, 2023.